# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

| | |
|---|---|
| ALLCO FINANCE LIMITED, | Case No. 3:15-cv-608-CSH |
| Plaintiff, | |
| v. | **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT** |
| ROBERT KLEE, in his official capacity as Commissioner of the CONNECTICUT DEPARTMENT OF ENERGY AND ENVIRONMENTAL PROTECTION, and ARTHUR HOUSE, JOHN W. BETKOSKI III, and MICHAEL CARON, in their official capacity as Commissioners of the CONNECTICUT PUBLIC UTILITIES REGULATORY AUTHORITY. | |
| | July 19, 2015 |
| Defendants. | |

Thomas Melone, Esq.
Allco Renewable Energy Limited
77 Water Street, 8th floor
New York, New York 10005
(212) 681-1120
Thomas.Melone@AllcoUS.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

INTRODUCTION ............................................................................ 1

STATEMENT OF FACTS ................................................................. 5

STANDARD OF REVIEW ............................................................... 9

ARGUMENT ................................................................................ 10

I.   COUNT I-VIOLATION OF THE FEDERAL POWER ACT AND THE
     SUPREMACY CLAUSE. ......................................................... 10

   A.   Standing and jurisdiction as to Count I ......................... 10

      1.   Allco's claims are ripe ............................................. 10

      2.   Allco has established standing ................................. 15

         i.    Allco has shown an injury-in-fact ..................... 16
         ii.   Allco established causation ............................... 17
         iii.  Allco's injury is redressable ............................. 18
         iv.   Allco has prudential standing .......................... 19

      3.   Allco is not collaterally estopped from pursuing its
           pre-emption claim .................................................. 19

      4.   16 U.S.C. 824a-3(h)(2)(B) does not strip this Court of
           subject matter jurisdiction .................................... 20

         i.    Status as a QF is not needed to bring Allco's claims ........ 20

         ii.   A Section 210(h)(2) action is an action
               commandeering a State to implement federal law,
               which is unconstitutional .................................. 21

iii.  Actions related to the operations of a QF subject to part II of the FPA (which would be at issue) are outside the scope of Section 210(h)(2) ............................. 23

iv.  There is nothing in Section 210 of PURPA that prevents direct declaratory action or other action based upon the rules issued by the FERC under Section 210(a). ............. 25

v.  The plain language of Section 210(h)(2) is narrowly drawn and would not apply here. ................................... 27

vi.  Even if relevant the administrative exhaustion requirement in Section 210(h)(2)(B) is not jurisdictional 27

B.  The Merits of Count I ............................................... 29

1.  The Defendants fail to engage the main issue—there is a bright line between wholesale sales and other actions that may have only an indirect effect on the electricity market ..................................................... 29

2.  Recent decisions by the Third and Fourth Circuits confirm that the Defendants proposed actions are preempted .......... 33

3.  Connecticut's portfolio management authority, and its authority over "local facilities" does not permit the intrusion in a field of exclusive Federal jurisdiction .......... 36

II.  COUNT II-VIOLATION OF THE DORMANT COMMERCE CLAUSE ......... 40

A.   Standing and jurisdiction as to Count II ......................................... 40

   1.   The Plaintiff's Dormant Commerce Clause claim is
        redressable ................................................................................ 40

B.   The Merits of Count II ..................................................................... 41

   1.   The Defendants ban on out-of-region RECs is *per se*
        unconstitutional. ...................................................................... 41

   2.   NEPOOL has discredited the Defendants' purported
        justifications for its ban on out-of-region RECs.................... 46

III.   COUNT III-VIOLATION OF 42 U.S.C. § 1983 ..................................... 48

A.   The Defendants have failed to rebut the presumption that
     Allco has a claim under 42 U.S.C. § 1983 ....................................... 48

   1.   The Plaintiff's rights are presumptively enforceable by
        42 U.S.C. § 1983 ...................................................................... 48

   2.   The Second Circuit has already recognized that an
        action under Section 210(h)(2) is neither an exclusive
        nor comprehensive PURPA remedy ....................................... 51

   3.   Section 210(h)(1) provides for direct enforcement ............... 52

   4.   There are other signposts in the FPA and PURPA that
        support the conclusion that the expression of the
        Section 210(h)(2)(B) action did not preclude others.  ........... 53

        i.    Section 824v ................................................................... 53
        ii.   Section 123 and the Conference Report ........................ 53

B.   The Defendants are not immune from liability under 42
     U.S.C. § 1983 .................................................................................. 55

CONCLUSION ................................................................................. 57

# TABLE OF AUTHORITIES

## CASES

*Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967) ........................... 12

*Alliance for Clean Coal v. Miller,* 44 F.3d 591 (7th Cir. 1995) .............. 42

*Arbaugh v. Y&H Corporation,* 546 U.S. 500 (2006) ............................... 28

*Arizona v. United States*, 132 S. Ct. 2492 (2012) ................................... 36

*Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935) ............................... 45

*Brimmer v. Rebman*, 138 U.S. 78 (1891) ................................................ 45

*City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113 (2005) .......... 49,50

*Clinton v. City of New York*, 524 U.S. 417 (1998) ........................ 15,17,18

*Entergy Nuclear Vermont Yankee, LLC v. Shumlin,* 733 F.3d 393 (2d Cir. 2013) ...................................................................................... 37

*FEC v. Akins*, 524 U.S. 11 (1998) ........................................................... 13

*FERC v. Mississippi*, 456 U.S. 742 (1982) ............................. 16,21,23,26

*FPC v. S. Cal. Edison Co.*, 376 U.S. 205 (1964) ..................................... 30

*Freehold Cogeneration Assoc. L.P. v. Bd. Regulatory Comm'rs,* 44 F.3d 1183 (3d Cir. 1995) ............................................................... 50,51

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC) Inc.*, 528 U.S. 167 (2000) ................................................................................. 10

*Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103 (1989). ...................................................................................................... 49

*Gonzaga University v. Doe,* 536 U.S. 273 (2002) ................................... 48

*Great Atlantic & Pacific Tea Co. v. Cottrell*, 424 U.S. 366 (1976) ......... 45

*Hughes v. Oklahoma,* 441 U.S. (1979) .................................................. 4,44

*Illinois Commerce Commission v. FERC,* 721 F.3d 764 (7th Cir. 2013) *cert. den.* 134 S. Ct. 1277 (2014) ......................................... 41,42

*Indep. Energy Producers Ass'n v. California Pub. Utils. Comm'n,* 36 F.3d 848 (9th Cir. 1994) ............................................................... 51,52

*Lewis v. BT Investment Managers, Inc.,* 447 U.S. 27 (1980) ............... 45

*Makarova v. United States,* 201 F.3d 110 (2d Cir. 2000) ........................ 9

*Maine v. Taylor,* 477 U.S. 131 (1986) .................................................... 41

*Maryland v. Wynne,* 135 S. Ct. 1787 (2015).......................................... 43

*Nat'l Fed'n of Indep. Bus. v. Sebelius,* 132 S. Ct. 2566 (2012) .......... 22,23

*Ne. Bancorp, Inc. v. Bd. of Governors of the Fed. Reserve Sys.,* 472 U.S. 159 (1985) .............................................................................. 44,45

*New England Power Co. v. New Hampshire,* 455 U.S. 331 (1982). ....... 30

*New York v. FERC,* 535 U.S. 1 (2002) ...................................... 15,31,37,50

*New York v. United States,* 505 U.S. 144, 162 (1992) ........................... 22

*Niagara Mohawk Power Corp. v. FERC,* 306 F.3d 1264 (2d Cir. 2002) .............................................................................................. 28,51

*Ohio Forestry Ass'n, Inc. v. Sierra Club,* 523 U.S. 726, 733 (1998) ...... 12

*Oregon Waste Systems, Inc. v. Department of Environmental Quality,* 511 U.S. 93 (1994) ................................................................ 42

*Pacific Gas & Elec. Co. v State Energy Resources Conservation and Development Comm'n.,* 461 U.S. 190 (1983) ............................... 12

*Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89 (1984) ............................................................................................... 55,56

*Pharm. Research & Mfrs. of Am. v. Concannon,* 249 F.3d 66 (1st Cir. 2001) ............................................................................................ 19

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) .................................... 47

*Postlewaite v. McGraw-Hill, Inc.*, 333 F.3d 42 (2d Cir. 2003) .............. 20

*PPL EnergyPlus LLC v. Hanna*, 977 F. Supp. 2d 372, 393-94 (D.N.J. 2013) *aff'd*, 766 F.3d 241 (3d Cir. 2014), *petitions for cert. filed*, Nos. 14-634, 14-694 ............................................. 34

*PPL EnergyPlus LLC v. Nazarian*, 753 F.3d 467 (4th Cir. 2014), *petitions for cert. filed*, Nos. 14-614, 14-623.................21,33-35, 38-39

*PPL EnergyPlus LLC v. Nazarian*, 974 F. Supp. 2d 790 (D. Md. 2013), *aff'd*, 753 F.3d 467 (4th Cir. 2014), *petitions for cert. filed*, Nos. 14-614, 14-623 .................................................... 33

*PPL EnergyPlus LLC v. Solomon*, 766 F.3d 241 (3d Cir. 2014), *petitions for cert. filed*, Nos. 14-634, 14-694.............................21,32-35

*Printz v. United States*, 521 U.S. 898 (1997) .................................... 22,23

*Regional Rail Reorganization Act Cases*, 419 U.S. 102 (1974) ............. 12

*Scheuer v. Rhodes*, 416 U.S. 232 (1974) (overruled, on other grounds, by *Davis v. Scherer*, 468 U.S. 183 (1984)) .......................... 56

*Sebelius v. Auburn Reg'l Med. Ctr.,* 133 S. Ct. 817 (2013).................... 28

*Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238 (1984) .............................. 32

*S. Cal. Edison Co. v. FERC,* 195 F.3d 17 (D.C. Cir. 1999)..................... 50

*Smith v. Robinson*, 468 U.S. 992 (1984) ................................................ 49

*St. Thomas-St. John Hotel & Tourism Ass'n v. Virgin Islands*, 218 F.3d 232 (3d Cir. 2000) ........................................................ 19

*Taubman Realty Group Ltd. Partnership v. Mineta*, 320 F.3d 475 (4th Cir. 2003) ................................................................. 19

*Thompson v. Cnty. of Franklin,* 15 F.3d 245 (2d Cir. 1994).................... 9

*Utah v. Evans*, 536 U.S. 452 (2002) ..................................................... 13

*Wilderness Soc'y v. Kane County*, 632 F.3d 1162 (10th Cir. 2011) (en banc) ............................................................... 19

*Will v. Michigan Dep't of State Police,* 491 U.S. 58 (1989) .............. 55,56

*W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186 (1994) ........................ 41

*Wyoming v. Oklahoma,* 502 U.S. 437 (1992).......................................... 42

STATUTES

15 U.S.C. § 3207 (Section 307 of PURPA) ........................................... 53

16 U.S.C. § 796(17)(A) ............................................................................. 1

16 U.S.C. § 824 (FPA §201).................................................................... 30

16 U.S.C. § 824(a) (FPA §201(a)) .......................................................... 31

16 U.S.C. § 824(b) (FPA §201(b)) ..................................................29-32,39

16 U.S.C. § 824d (FPA §205)........................................................ 4, 24, 26

16 U.S.C. § 824e (FPA §206) ................................................................. 32

16 U.S.C. § 824a-3 (Section 210 of PURPA).................................. *passim*

16 U.S.C. § 824a-3(a) (Section 210(a) of PURPA) ............................ 25,27

16 U.S.C. § 824a-3(e) (Section 210(e) of PURPA)................................. 51

16 U.S.C. § 824a-3(f) (Section 210(f) of PURPA).....................23,25-27,29

16 U.S.C. § 824a-3(g) (Section 210(g) of PURPA) ......................... 26,29,54

16 U.S.C. § 824a-3(h) (Section 210(h) of PURPA).....16,21-25,27,29,48-53

16 U.S.C. § 824a-3(m) (Section 210(m) of PURPA)............................... 25

16 U.S.C. § 824v.................................................................................... 53

16 U.S.C. § 825p ..............................................................................20,24-25

16 U.S.C. § 2633(a) (Section 123(a) of PURPA) ........................... 26,29,53

28 U.S.C. § 1331.........................................................................20,25,26

42 U.S.C. § 1983 .......................................................................21,48,55,56

OTHER AUTHORITIES

U.S. Const. Art. I, § 8, cl. 3 ...................................................... 44

18 C.F.R. § 292.304.................................................................. 16,23,52

18 C.F.R. § 292.601.................................................................. 16

Conn. Gen. Stat. § 16-1(a) ...................................................... 40

Conn. Gen. Stat. § 16-245a ..................................................... 5,40

Conn. Public Act 13-303 .......................................................... 7

*In the Matter of the Appeal Case Brookfield Energy Marketing,*
   *Inc.*, No. 02-NE-BD-2008 (NEPOOL Board of Review 2009) ....... 46,47

*Restatement (Second) of Judgments* § 27 (1982) ..................... 20

Steven Ferrey, "Threading the Constitutional Needle with Care:
   The Commerce Clause Threat to the New Infrastructure of
   Renewable Power," 7 Texas J. Oil, Gas & Energy Law 59, 69,
   106-07 (2012) ...................................................................... 42

*FERC Policy Statement,* 23 FERC P61,304, 61,643 (1983)............... 24,25

*Joint Explanatory Statement of the Committee of Conference,*
   H.R. Conf. Rep. 95-1750, H.R. Conf. Rep. No. 1750, 95th Cong.,
   2nd Sess. 1978, 1978 U.S.C.C.A.N. 7797. ...........................24-26,29,54

*So. Cal. Edison Co. & San Diego Gas & Elec. Co.,* 71 FERC ¶
   61,269 (1995). ..................................................................... 32

*The United Illuminating Company*, 123 FERC ¶ 61,269 (2008)............ 17

## INTRODUCTION

Plaintiff Allco Finance Limited ("Plaintiff" or "Allco") hereby files this memorandum of points and authorities in opposition to the Defendants' Motions to Dismiss the Complaint filed on June 19, 2015.[1]

Regarding Article III standing, Allco's argument is straightforward:  It will suffer an injury-in-fact when it is forced to compete in the Commissioner's procurement with large generators which are not Qualifying Facilities (or "QFs") under the Public Utility Regulatory Policies Act ("PURPA") (*see*, 16 U.S.C. § 796(17)(A)).  Its injury-in-fact is fairly traceable to the violation of federal law that Allco alleges:  namely, that the Federal Power Act ("FPA") does not permit a State to compel a wholesale electricity transaction, unless the transaction is with a QF, and thus, under federal law, those generators should be excluded from the procurement; and Allco's injury is

---

[1] Many of the issues raised in the Motions to Dismiss are before the Second Circuit Court of Appeals in *Allco v. Klee,* No. 15-20 (2d Cir. filed January 2, 2015).  This Court may therefore wish to defer action on the Motions to Dismiss until the Second Circuit issues its opinion.  That case is scheduled for submission on September 2, 2015, although since that submission order was issued, the Second Circuit requested supplemental briefing by the parties regarding issues involving 16 U.S.C. §824a-3(h)(2)(B).  Supplemental briefing was completed on July 17, 2015.

redressable, because its projects ranked high on the Commissioner's list in the prior procurement, and because the Commissioner has indicated his intent to conduct the procurement challenged in this case.

On preemption, Allco's claim is again straightforward: in the FPA, Congress has occupied the field of wholesale sales of electricity.  Thus, States may not enter that field of regulation.  In PURPA, Congress subsequently carved out a role for States to regulate wholesale sales by QFs; but, with respect to wholesale sales by other generators, States are not permitted to regulate. Here, the Commissioner plainly intends to transgress that line by directing the Connecticut Utilities to enter wholesale contracts with counterparties of his choosing.  Compelling a wholesale transaction – one that would not have taken place but for the State's compulsion – plainly involves the regulation of wholesale sales, and thus falls squarely within the field that Congress has occupied.

The Defendants' arguments to the contrary simply do not engage with this basic principle.  The Defendants contend that States retain significant authority to direct a utility's procurement decisions, including by requiring utilities to secure power generated by certain types of generation facilities.  But such programs still leave the utilities

themselves free to determine which particular generators to contract with. Those programs do not involve compelling particular wholesale transactions. Likewise, States retain authority to review the prudence of utility purchase decisions. But prudence review involves an after-the-fact review of the utility's business judgment in entering into a particular transaction. Prudence review does not involve compelling a transaction in the first place.

What is more, the Defendants' violation of the FPA is no mere technical intrusion into a federal field; rather, it is in conflict with the Federal Energy Regulatory Commission's ("FERC") market-based approach to regulating the New England region. A market-based system, in which generators compete with one another to enter wholesale electricity contracts with willing purchasers, is simply incompatible with a scheme in which the State, through a command-and-control process, directs the utility as to which contracts it shall enter.

With respect to Connecticut's ban on Plaintiff's out-of-region renewable energy credits ("RECs"), Allco's claim is again simple. The Framers of the Constitution intended the Commerce Clause to prevent

the "economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Hughes v. Oklahoma*, 441 U.S. 322, 325-326 (1979). Balkanization is exactly what the Defendants advocate.   The Defendants' chief defense is that 90% of its RECs are purchased from out-of-state, thus Connecticut argues that its law does not favor in-state interests.   Creating economic regions among States that would band together and prohibit commerce, ban products or impose tariffs on commerce from States outside their preferred region is one of the chief evils that the Commerce Clause was intended to prohibit.   And here, the Defendants' recognition of Allco's RECs for purposes of its Connecticut Clean Energy Options program, and its use of the North American Renewables Registry (NAR) REC tracking system, is tantamount to a confession that its out-of-region REC ban in other contexts is unjustified by any measure.   Moreover, the New England Power Pool Operator ("NEPOOL") has rejected the policy basis of the geographical restriction that Connecticut advances here to justify it ban.   NEPOOL has called the ban inconsistent with the Regional Greenhouse Gases Initiative, inefficient, and contrary to the goal of

4

reducing trade barriers. NEPOOL also stated that Connecticut's ban fails to recognize that the Northeast's clean air concerns extend far beyond the New England States and adjacent control areas.

Finally, both the claim against Connecticut's ban on Allco's out-of-region RECs, and the claim against the Defendants' imminent procurement (which also bans Allco's out-of-region RECs) are ripe for resolution.

## STATEMENT OF FACTS

Connecticut has established a renewable portfolio standard ("RPS")(*see* Conn. Gen. Stat. § 16-245a) that requires electric suppliers to have a certain percentage of their electricity mix be attributable to renewable energy sources. In 2015, that percentage is 15% for Class I RECs increasing to 20% by 2020. [Compl. ¶22.] The RPS requirement can be satisfied by an electric supplier owning renewable generation, entering into a power purchase agreement to acquire renewable energy and the associated RECs, or by the acquisition of RECs alone. [Compl. ¶23.] Conn. Gen. Stat. § 16-245a(b)(1) restricts the RECs that otherwise would qualify for the RPS to two types of RECs. [Compl. ¶24.]

5

The first type of qualifying Connecticut RECs are for energy produced by a renewable energy generating unit that is located within the ISO-New England control area (i.e., Connecticut, Massachusetts, Vermont, New Hampshire, Rhode Island and most of Maine).  This type of REC only requires that the generator be located in the ISO-New England control area.  [Compl. ¶25.]  The second class of qualifying Connecticut RECs are for energy produced by a renewable energy generating unit that is located within a control area that is adjacent to the ISO-New England control area.  The control areas adjacent to ISO-New England are ISO-New York, the area in Northern Maine administered by the Northern Maine Independent System Administrator, Inc. ("NMISA"), and Quebec and New Brunswick in Canada.  However, RECs related to energy produced from those adjacent areas only qualify as Connecticut RECs if one other significant condition is satisfied: that the generator obtain potentially costly transmission rights to transmit the energy to ISO-New England for consumption within ISO-New England. [Compl. ¶26.]  RECs from generating facilities located in States outside of ISO-New England or an adjacent control area do not qualify as Connecticut RECs under any conditions. [Compl. ¶27.]

6

In 2013, Connecticut enacted a statute empowering the Commissioner to solicit proposals for renewable energy, to select winners of the solicitation, and to compel Connecticut's two electric utilities (the "Connecticut Utilities") to enter into long-term contracts for the sale of wholesale electricity and/or Connecticut qualifying RECs with the winners. Conn. Public Act 13-303 § §6-8. [Compl. ¶28.] On February 26, 2015, the Department issued a draft request for proposals under Section 6 and 7 of Public Act 13-303 ("Sections 6 and 7"). [Compl. ¶29.] The Department stated that it planned to issue the final request for proposals, which is likely to be in substantially the same form as the draft RFP (the "RFP"), in the spring of 2015 and compel wholesale energy transactions soon after it completes its review of proposals.

On June 25, 2015, the Commissioner and his proposed co-issuers of the RFP published the final draft form of the RFP, and his co-issuers have filed the final document with the Massachusetts Department of Public Utilities for approval.[2] The entire purpose of the draft RFP is begin the imminent implementation of the exercise the Commissioner's

---

[2] See, http://cleanenergyrfp.com/documents/. The Commissioner needs no approval from any other State agency to issue the RFP.

authority under Sections 6 and 7 to compel those transactions. [Compl. ¶30.]

The RFP will not be the first time that the Commissioner solicited proposals under Section 6. The Commissioner had previously solicited proposals under Section 6 in 2013. Allco's QFs responded to that 2013 solicitation and were in the competitive range, with one facility proposing a lower price than one of the facilities selected, and another facility next in line behind one of the selected facilities. [Compl. ¶31.] Allco intends to respond to the RFP with its QFs located in Connecticut, some of which would be smaller than 20 megawatts in size. Allco's QFs located in Connecticut are likely to be in the competitive range with other responses to the RFP (as they were in the prior solicitation under Section 6), particularly so if unlawful terms, conditions and competition are eliminated. [Compl. ¶32.] In addition, Allco has RECs to sell to the Connecticut Utilities from a QF located in the State of Georgia. Connecticut law and the terms of the RFP, however, have banned those RECs from qualification in the State of Connecticut. [Compl. ¶33.]

Allco is also the owner of a QF in New York, an ISO-New England adjacent control area, which will generate RECs. But that QF will not

deliver its electricity to the ISO-New England control area because of the additional cost burdens involved in doing so. Connecticut law and the terms of the RFP have banned those RECs from qualification in the State of Connecticut. [Compl. ¶34.] The Commissioner plans to exercise his authority under Sections 6 and 7 to compel interstate wholesale energy transactions with non-QFs, as he did with respect to his previous solicitation under Section 6. [Compl. ¶36.]

## STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the court's subject matter jurisdiction over the asserted claims. A jurisdictional challenge under Rule 12(b)(1) may be made either on the face of the pleadings or by presenting extrinsic evidence. *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir. 2000). As the party seeking to invoke the Court's jurisdiction, Plaintiff bears the burden of establishing constitutional standing and therefore subject matter jurisdiction over its claim. *Id.* A district court accepts all allegations of fact in the complaint as true and construes them in the light most favorable to the plaintiff. *Thompson v. Cnty. of Franklin,* 15 F.3d 245, 249 (2d Cir. 1994).

9

To satisfy constitutional standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC) Inc.*, 528 U.S. 167, 180–81 (2000).

## ARGUMENT

I. <u>COUNT I-VIOLATION OF THE FEDERAL POWER ACT AND THE SUPREMACY CLAUSE.</u>

   A. <u>Standing and jurisdiction as to Count I.</u>

   1.  Allco's claims are ripe.

The Defendants do not dispute that Counts II and III are ripe. The Defendants only argue that Allco's pre-emption claim is not ripe, using the same maneuver that the Commissioner employed in *Allco Finance Limited v. Klee*, Civ. A. No. 13-cv-1874, 2014 WL 7004024 (D. Conn. Dec. 10, 2014) ("*Allco I*"). There the Commissioner argued that Allco's claim was not redressable because the procurement in that case had concluded, and it was only conjectural that the Commissioner

10

would engage in another procurement. *Id.* at 11 ("if the Court were to void the results of the Section 6 procurement, Defendant explains that 'the state might very well take no further action'"). As Allco predicted, soon after the District Court issued its decision, the Commissioner announced the procurement that is the subject of this action.

Now that the Commissioner has announced his intention to conduct another, substantially identical, procurement, the Commissioner is arguing that it is too early for a challenge because there is no certainty that the Commissioner will actually move forward with the announced procurement. The Commissioner's jurisdictional arguments amount to nothing more than a never-ending shell game.

Absolute certainty is not a requirement of ripeness. Here the Commissioner has announced his intention to issue the procurement, has solicited comments on the RFP, and, since the filing of the complaint, has published the RFP in final form. Indeed some of the Commissioner's co-issuers of the RFP have already filed it with the Massachusetts Department of Public Utilities seeking approval of that final form.

11

The "question of ripeness turns on 'the fitness of the issues for judicial decision' and 'the hardship to the parties of withholding court consideration.'" *Pacific Gas & Elec. Co. v State Energy Resources Conservation and Development Comm'n.*, 461 U.S. 190, 201 (1983) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967)). Relevant factors are: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998). "One does not need to await the consummation of threatened injury to obtain preventive relief.  If the injury is certainly impending that is enough." *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 143 (1974).

Despite the Commissioner's allegations that one thing or another might change, the Commissioner has not retreated from his announcement that he intends to issue the RFP in substantially the same form as challenged.  The Supreme Court has repeatedly and squarely held that a plaintiff can establish standing based on the

*predicted* behavior of executive officials, even if that behavior is not guaranteed. In *Utah v. Evans*, 536 U.S. 452 (2002), the Supreme Court held that Utah had standing to challenge a census report, even though no executive official had any obligation to follow the terms of the new report. *Id.* at 463-64. The court found it "substantially likely" that the Executive Branch would abide by the new report, and thus held that the "practical consequence" of altering the report was "a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered," even though there was no guarantee that the Executive Branch would take any action based on the court's ruling. *Id.* at 464. Similarly, in *FEC v. Akins*, 524 U.S. 11, 25 (1998), the Court found that a plaintiff had "standing to obtain court determination that the organization was a 'political committee' where that determination would make agency more likely to require reporting, despite [the] agency's power not to order reporting regardless." *Evans*, 536 U.S. at 464 (describing *Akins*); *see also id.* (collecting other, similar cases). These cases show that as long as it is likely the agency will act, the plaintiff can establish standing, even if there is a possibility that the agency will ultimately decline to act.

13

That is the case here.  The predicted behavior of the Defendants point to only one conclusion—they will issue the RFP in all materials respects identical to the one challenged here, continuing their procurement activities under Sections 6 and 7, which are stated imperatives of the Malloy administration.  [Compl. ¶¶30, 36, 43]. Notably, the Defendants do not deny that intended and indeed substantially likely plan of action.

If, however, the Court has any doubt as to the Defendants' plan, a motion to dismiss is not the proper juncture to resolve such factual issues.  The assertions in the Complaint must be taken as true with all inferences resolved in Plaintiff's favor.

Moreover, based upon the Supreme Court's enumerated factors, the issues presented in this case are clearly fit for judicial review.  *First*, they are purely legal questions that do not depend upon any further factual development related to changes to the RFP that the Commissioner asserts "might" be made.  *Second*, the Plaintiff intends to submit a proposal in response to the RFP.  [Compl. ¶32.] By having to compete with large non-QF generators Plaintiff is injured as Plaintiff will be denied the right to participate in the process free of the

14

Commissioner's unlawful actions.  *Clinton v. City of New York*, 524 U.S. 417, 433 n.22 (1998) ("[A] denial of a benefit in the bargaining process can itself create an Article III injury, irrespective of the end result.") Even now the Plaintiff suffers injury.  Once the Commissioner announced his intention to issue the RFP, large non-QF may compete for the same sites that Plaintiff would compete for in preparation for submissions to the RFP.  Further, withholding review creates a hardship for Plaintiff (as well, of course, for every other QF that would plan to submit a proposal in response to a lawfully conducted procurement).  *Third*, judicial intervention would not interfere with further administrative action; and the Court would not benefit from further factual development of the issues presented.  Therefore this case is ripe for review.

## 2.    Allco has established standing.

Congress enacted PURPA to address the conditions in the electricity market that evolved since the passage of title II of the FPA in 1935. *See, New York v. FERC*, 535 U.S. 1, 9 (2002) ("*New York*").  In Title II of PURPA, Congress amended the FPA and enacted Section 210 of PURPA in order to create a new class of "favored cogeneration and

small power facilities" in the overall regulatory scheme of the Nation's energy markets. *FERC v. Mississippi*, 456 U.S. 742, 751 (1982).[3]  Allco, as a favored QF under PURPA, is *precisely* the type of plaintiff Congress intended to benefit when it created the new class of market participant in the Nation's energy markets.  *See*, *S. Cal. Edison Co. v. FERC*, 195 F.3d 17, 23 (D.C. Cir. 1999) ("in deciding to confer substantial benefits on 'small power production facilities' Congress took care to define the class of potential beneficiaries.")

### i.   Allco has shown an injury-in-fact.

Allco will suffer an injury-in-fact when it is forced to compete in the Commissioner's procurement with large generators, which are not QFs.  [Compl. ¶46.]  Congress relaxed the ban on State's involvement in the area of wholesale sales in order to benefit QFs, such as Allco's. [Compl. ¶46.]  Thus any procurement that attempts to go beyond the limits set by Congress harms the very market participants that Congress intended to benefit. [Compl. ¶46.]   Allco is not required to

---

[3] Section 210(a) of PURPA provides all QFs with a guaranteed federal right to sell a QF's energy and capacity to electric utilities at a calculable price. *See*, 16 U.S.C. §824a-3(a); 18 C.F.R. §292.304.  That right is enforceable as a rule under the FPA. (*see*, 16 U.S.C. §824a-3(h)(1)).  Sales by QFs are also given preference under Sections 205 and 206 of the FPA. (*see*, 18 C.F.R. §292.601(c)(1)).

show that it will receive a contract, although the Commissioner's rankings from the prior procurement indicate Allco's QFs are likely to be in the competitive zone. [Compl. ¶31.]   *Clinton v. City of New York*, 524 U.S. 417, 433 n.22 (1998) ("[A] denial of a benefit in the bargaining process can itself create an Article III injury, irrespective of the end result.")  Allco is incurring costs to develop QF projects in Connecticut precisely because Congress designed them as favored market participants. [Compl. ¶54.]

The Commissioner's actions will be compounded by the effect that the addition of the selected projects would have on the Connecticut Utilities' cost structure in a manner that would cause Allco to earn lower profit from future energy sales under a PURPA contract. [Compl. ¶52.][4]  These injuries easily establish Allco's injury-in-fact.

### ii.   Allco established causation.

---

[4] The PURA Defendants assert (*see*, PURA Memo. at 20) that the FERC has "adopted the rebuttable presumption that the PURPA must-buy requirement no longer exists in Connecticut."  That statement is simply not true, and represents a misunderstanding of PURPA Section 210(m) and the related FERC's rules.  The Connecticut Utilities are still subject to PURPA.  Only one Connecticut Utility has been relieved of its obligation to purchase from QFs in excess of 20 megawatts in size. *See*, *The United Illuminating Company*, 123 FERC ¶ 61,269 at P1 (2008).

The Defendants do not dispute that Allco could show causation. Allco's injury-in-fact is fairly traceable to the violation of federal law that Allco alleges: namely, that the FPA does not permit a State to compel a wholesale electricity transaction, unless the transaction is with a QF, and thus, under federal law, non-QF large generators should be excluded from the procurement. This "denial of a benefit in the bargaining process," *Clinton*, 524 U.S. at 433 n.22, will be plainly caused by the Commissioner's own decision to include non-QFs in the procurement.

### iii.   Allco's injury is redressable.

Allco's injury is redressable because its projects were in the competitive range in the prior procurement and the Commissioner has announced his intent to conduct future procurements in which Allco will participate, including the one at issue here.

Thus, at the very least, an order in Allco's favor in this case will prevent the Defendants from engaging in the same unlawful conduct in the announced procurement, and will prevent an adverse effect on revenue that Allco's QFs would earn from future energy sales under a PURPA contract at the Connecticut Utilities' avoided costs.

18

### iv.   Allco has prudential standing.

Allco also has prudential standing. First, Allco has prudential

standing under the Supremacy Clause because that constitutional

provision imposes no zone-of-interest requirement.  *See, e.g.*, *Pharm.*

*Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 73 (1st Cir. 2001);

*St. Thomas-St. John Hotel & Tourism Ass'n v. Virgin Islands*, 218 F.3d

232, 241 (3d Cir. 2000); *Taubman Realty Group Ltd. Partnership v.*

*Mineta*, 320 F.3d 475, 481 (4th Cir. 2003); *see also Wilderness Soc'y v.*

*Kane County*, 632 F.3d 1162, 1170 (10th Cir. 2011) (en banc) (collecting

authority holding that the zone-of-interests requirement does not apply

in the Supremacy Clause context). Second, Allco has prudential

standing under the FPA because it is at least arguable that the Act was

intended to protect the interests of market participants, and in

particular those of QFs, which Congress specifically sought to benefit

through PURPA.

### 3.   Allco is not collaterally estopped from pursuing its preemption claim.

The District Court's decision in *Allco I* has no preclusive effect

here for the simple reason that the District Court's opinion was based

upon multiple grounds for dismissal.  Such alternative decision making

precludes preclusive effect.  *Postlewaite v. McGraw-Hill, Inc.*, 333 F.3d 42 , 51 (2d Cir. 2003) citing *Restatement (Second) of Judgments* § 27 comment i (1982) ("If a judgment of a court of first instance is based on determinations of two issues, either of which standing independently would be sufficient to support the result, the judgment is not conclusive with respect to either issue standing alone.").

The decision in *Allco I* has no preclusive effect for another reason. Because the District Court dismissed the complaint on standing grounds related to "disappointed bidder" status (which is not relevant here), any other grounds stated in the decision were not necessarily decided and thus have no preclusive effect. *Restatement (Second) of Judgments* § 27 comment j (1982).

### 4.   16 U.S.C. 824a-3(h)(2)(B) does not strip this Court of subject matter jurisdiction.

#### i.   Status as a QF is not needed to bring Allco's claims.

Allco's Count I is straightforward and does not rely on the private right of action under Section 210(h)(2)(B) of PURPA. Rather it is based on the FPA, and the grant of jurisdiction to the Federal district courts in 16 U.S.C. § 825p and 28 U.S.C. § 1331.  Recent examples of similar claims invalidating State action under the FPA for crossing the bright

line regulating wholesale energy transactions are *Nazarian* and

*Solomo*n.[5] Allco's status as a small power producer, however, is relevant

to Allco's Article III standing and to explain why Allco's injury is

redressable.  Similarly Count II is based upon Allco's ownership of

RECs, which is not dependent upon QF status.  Likewise, Count III is a

claim under 42 U.S.C. § 1983, which is wholly outside Section

210(h)(2)(B).

### ii.   A Section 210(h)(2) action is an action commandeering a State to implement federal law, which is unconstitutional.

An action under Section 210(h)(2)(B) is an action that seeks to

enforce Section 210(f), which requires each State to implement the

FERC's rules issued under Section 210(a).  In *FERC v. Mississippi*, 456

U.S. 742, 751, 760-761 (1982), the Supreme Court did not strike down

Section 210(f) because the FERC interpreted it as not requiring a State

to do anything that it was not voluntarily doing already, i.e., being a

forum for disputes.  The Supreme Court did not address the

constitutionality of Section 210(h)(2) as against a State.  But a Section

---

[5] *PPL EnergyPlus LLC v. Nazarian,* 753 F.3d 467 (4th Cir. 2014), *petitions for cert. filed,* Nos. 14-614, 14-623 ("*Nazarian*") and *PPL EnergyPlus LLC v. Solomon*, 766 F.3d 241 (3d Cir. 2014), *petitions for cert. filed*, Nos. 14-634, 14-694 ("*Solomon*").

210(h)(2) action is, by definition, an action that seeks to commandeer a State to adopt a federal regulatory scheme as its own.  "[T]he Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *New York v. United States*, 505 U.S. 144, 162 (1992).

Thus the Supreme Court has struck

> "down federal legislation that commandeers a State's legislative or administrative apparatus for federal purposes. *See, e.g., Printz*, 521 U.S., at 933, 117 S. Ct. 2365, 138 L. Ed. 2d 814 (striking down federal legislation compelling state law enforcement officers to perform federally mandated background checks on handgun purchasers); *New York, supra*, at 174-175, 112 S. Ct. 2408, 120 L. Ed. 2d 120 (invalidating provisions of an Act that would compel a State to either take title to nuclear waste or enact particular state waste regulations)."

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2602 (2012).

"'[T]he Constitution simply does not give Congress the authority to require the States to regulate.' *New York*, 505 U.S., at 178, 112 S. Ct. 2408, 120 L. Ed. 2d 120. That is true whether Congress directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system as its own." *Nat'l Fed'n of Indep. Bus.,* 132 S. Ct. at 2602.

Section 210(f)(1) commands States to implement federal law.  In light of *Printz* and its progeny it is questionable whether the *FERC v. Mississippi* holding regarding Section 210(f)(1) is still good law.  Even if it is, an action under Section 210(h)(2) is, by definition, an action to commandeer a State to implement requirements of federal law.  Such an action is unconstitutional under the precedent cited above.  "[T]he Constitution simply does not give Congress the authority to require the States to . . . adopt a federal regulatory system as its own." *Nat'l Fed'n of Indep. Bus.,* 132 S. Ct. at 2602. (internal citations and quotations omitted.)  As such, it is not a remedy at all, and cannot form the basis for an exhaustion requirement.

### iii.   Actions related to the operations of a QF subject to part II of the FPA (which would be at issue) are outside the scope of Section 210(h)(2).

Section 210(h)(1) provides for a separate action for "any operations of an electric utility, a qualifying cogeneration facility or a qualifying small power production facility which are subject to the jurisdiction of the Commission under part II of the Federal Power Act." Operations of a QF include the QF's put right at the long-term rate under 18 C.F.R. §292.304(d)(2)(ii), i.e., an electric utility's must-buy obligation, as well

23

as any wholesale sale to an electric utility. *See*, FPA §§ 205, 206; 18 C.F.R. § 292.601; *Joint Explanatory Statement of the Committee of Conference,* H.R. Conf. Rep. 95-1750, H.R. Conf. Rep. No. 1750, 95th Cong., 2nd Sess. 1978, 1978 U.S.C.C.A.N. 7797 *("Conference Report" or "Conf. R.")* at 7833; *See also*, *Policy Statement Regarding the Commission's Enforcement Role Under Section 210 of the Public Utility Regulatory Policies Act of 1978*, 23 FERC P61,304, 61,646 (1983) ("*FERC Policy Statement*").

Section 210(h)(1) expressly provides that the rules that the FERC has prescribed under Section 210(a) are rules under the FPA to the extent they relate to such operations. This aspect is crucial. This provision specifically throws suits related to the operations of a QF back into the general rule of Section 825p of the FPA giving broad and exclusive jurisdiction to the federal courts. It also plainly shows that by including actions related to operations of a QF (which is what would be at issue) in Section 210(h)(1), those actions cannot also be included in Section 210(h)(2).[6]

---

[6] Section 210(h)(1) does not limit its enforcement to being brought by any specific person or against any particular person. Although Section 210(h) is titled "Commission enforcement," the private right of action in

### iv.   There is nothing in Section 210 of PURPA that prevents direct declaratory action or other action based upon the rules issued by the FERC under Section 210(a).

Federal district courts have jurisdiction under 16 U.S.C. § 825p to hear cases under the FPA (and rules enforceable under the FPA) and under federal law generally under 28 U.S.C. § 1331, including cases involving federal rules issued under Section 210(a) of PURPA.[7] Consider the situation where a QF seeks to sell its energy to an electric utility in a State that chose the Section 210(f) implementation option of

---

Section 210(h)(2)(B) demonstrates that more than FERC enforcement is contemplated.  In addition, the plain language of Section 210(h)(1) speaks in terms of "enforcement" but does not limit its applicability to enforcement by the FERC.  The specific expression of the words "Commission may enforce" are within Section 210(h)(2), but their absence in Section 210(h)(1) means that the plain language of the statute does not restrict a Section 210(h)(1) enforcement action to just the FERC. Moreover, it is easy to understand why Section 210(h) would include words related to FERC enforcement because unlike any other person, the powers of the FERC (and its ability to take action) are constrained to only those powers granted by Congress.  A person such as Allco is not so organically constrained.  *But see*, FERC Policy Statement at 61,646 (describing as exclusive to the FERC an action under Section 210(h)(1)).

[7] The rules issued by the FERC under 210(a) need no implementation by a State under Section 210(f) to be effective and binding. *See, e.g.*, Conf. R. at 7831 stating Section 210 requires the "States and utilities follow rules which the [FERC] is to prescribe." Section 210(m)(7) is also a recognition that a state regulatory authority need not be involved in the PURPA process at all, and that a QF's put right, or legally enforceable obligation, is imposed directly by Section 210.

resolving disputes on a case-by-case basis applying the FERC's rules, or completely refuses to be commandeered into implementing federal law. Thus there would be no "requirements" established by a State regulatory authority under Section 210(g)(2) that a QF could seek to enforce.[8] The dispute involves the operations of a QF because it involves the sale of the QF's energy. Because the dispute involves application of the FERC's rules it involves a federal question. Where does/must the QF bring the dispute? There is no provision in Section 210 that covers what is a most common scenario. On the other hand, there is nothing in the statute that restricts federal jurisdiction over such a claim either under 16 U.S.C. § 825p or 28 U.S.C. § 1331, and this Court should not invent one. Moreover, as explained herein, Congress made it clear that the expression of specific remedies only applied in the specifically enumerated circumstances and did not restrict jurisdiction to other rate related claims. *See*, Conf. R. at 7818.

---

[8] Section 210(g)(2) only applies to actions that satisfy two requirements. First, there must be a requirement established by a State regulatory authority. Second, the action must be one that seeks to enforce that requirement. Those requirements can only be established pursuant to notice and comment proceedings under Section 210(f), but do not need to be established at all. *See*, *FERC v. Mississippi*, 456 U.S. at 751. If those two criteria are met then any such action shall be brought in the manner and under the requirements of an "action" under Section 123.

26

### v.   The plain language of Section 210(h)(2) is narrowly drawn and would not apply here.

The plain language of Section 210(h)(2) shows that it applies in a very narrow set of circumstances.  By its plain terms it is an action to enforce the requirements of Section 210(f)(1).  Section 210(f)(1) requires that a State "after notice and opportunity for public hearing, implement" the FERC's rules or revised rules issued under Section 210(a).  Even if relevant and constitutional, what exactly would such an action look like under the circumstances of this case? Would it be that the Commissioner failed to provide notice and an opportunity for a public hearing before compelling a wholesale contract, or before violating Allco's rights?  Or would it be that the Commissioner's actions constituted proceedings implementing Section 210(a) and the Commissioner got it wrong? Even with doing various contortions, it is difficult to see how the facts of this case could be twisted into an action to commandeer a State to affirmatively implement FERC's rules under Section 210(a).

### vi.   Even if relevant the administrative exhaustion requirement in Section 210(h)(2)(B) is not jurisdictional.

27

The administrative exhaustion requirement is not jurisdictional but rather a claims-processing rule, which reinforces why it makes little sense to bring an action under 42 U.S.C. § 1983 first to the FERC. Since *Niagara Mohawk Power Corp. v. FERC,* 306 F.3d 1264 (2d Cir. 2002) was decided, the Supreme Court has adopted a "readily administrable bright line" for distinguishing statutory limitations that are jurisdictional from those that are, instead, "claim-processing rules" that "seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times," *Arbaugh v. Y&H Corporation*, 546 U.S. 500, 516 (2006).  The Supreme Court's bright line requires that, unless Congress has "'clearly state[d]'" that the statutory limitation is jurisdictional, "'courts should treat the restriction as nonjurisdictional in character.'" *Sebelius v. Auburn Reg'l Med. Ctr.*, 133 S. Ct. 817, 824 (2013) (quoting *Arbaugh*, 546 U.S. at 515-16). Though Congress need not "incant magic words in order to speak clearly," there must be clear contextual evidence that "Congress intended a particular provision to rank as jurisdictional." *See id*. (Citations omitted).

28

Here, when Congress intended a provision to be limiting in PURPA, it specifically used such language.  *See*, *e.g.,* Section 123(a) of PURPA (now codified in 16 U.S.C. §2633(a)) which expressly limits federal jurisdiction: "*Notwithstanding any other provision of law*, no court of the United States shall have jurisdiction over . . ."). (Emphasis added); *see also*, the Conference Report's discussion of Section 123 (stating "the jurisdiction of the Federal courts is limited by this section") and Section 210(g)(2) ("Any such action shall be brought *only* in the manner…") (Emphasis added).  Congress did not use such limiting language in Section 210(h)(2)(B). Thus, a failure to comply with the administrative exhaustion provision of 16 U.S.C. § 824a-3(f), even if relevant, would not strip the Court of subject matter jurisdiction

## B. The Merits of Count I.

### 1. The Defendants fail to engage the main issue—there is a bright line between wholesale sales and other actions that may have only an indirect effect on the electricity market.

The singular "but for" act that will bring the wholesale transactions into being in this case is state action compelling "the sale of electric energy at wholesale in interstate commerce". *See*, FPA §201(b)(1). The FPA "delegated to [FERC] exclusive authority to

regulate the transmission and sale at wholesale of electric energy in interstate commerce, without regard to the source of production." *New England Power Co. v. New Hampshire*, 455 U.S. 331, 340 (1982). That straightforward and unambiguous statutory delegation is found in the first sentence of FPA Section 201(b)(1).[9] *FPC v. S. Cal. Edison Co.*, 376 U.S. 205, 215 (1964) (Congress left "no power in the states to regulate … sales for resale in interstate commerce.").

In addition to the exclusive jurisdiction conferred over wholesale sales, the second sentence of FPA Section 201(b)(1) gives the FERC the exclusive jurisdiction over the *facilities* used for the sale of electric energy at wholesale in interstate commerce. The FERC's jurisdiction over facilities has an exception that provides the FERC:

> shall not have jurisdiction, except as specifically provided in this Part and the Part next following, over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter.

---

[9] 16 U.S.C. §824. The only exceptions to FERC's exclusive jurisdiction over wholesale sales, which are not relevant here, relate to retail sales and to certain sales related to hydroelectric facilities.

The plain language of the statute makes it clear that whatever authority is exercisable by a State under the State's authority over facilities does not extend to wholesale sales.[10]  That is the bright-line in this case.  The State's reserved authority to regulate facilities is of no relevance to the central issue, which is whether the specific transactions are "the sale of electric energy at wholesale in interstate commerce," and if they are, will the Commissioner exercise any authority over such wholesale sales.  The answer to both in this case is unquestionably yes.  The power purchase agreements that the Commissioner plans to solicit and compel are clearly wholesale sales of electric energy in interstate commerce.  In addition, those wholesale sales only will come into being because of the singular act of the Commissioner compelling those transactions.  Thus, the Commissioner is acting in a field of exclusive Federal jurisdiction, and his action is

---

[10] The language in Section 201(a) of the FPA referencing State authority is a mere policy declaration that does not affect the plain language in the first sentence of Section 201(b)(1).  *See, New York*, 535 U.S. at 22 ("we have described the precise reserved state powers language in § 201(a) as a mere policy declaration that cannot nullify a clear and specific grant of jurisdiction, even if the particular grant seems inconsistent with the broadly expressed purpose.) (internal quotations and citations omitted.)

pre-empted and the contracts void.[11] *See Silkwood v. Kerr-McGee Corp.*, 464 U.S. at 248 (1984) ("If Congress evidences an intent to occupy a given field, any state law falling within that field is pre-empted.").[12]

---

[11] *See also*, *Solomon*, 766 F.3d at 253-254, where the Third Circuit rejected the argument that a State's authority over new generation or utility portfolio management can provide an exception to FERC's sale jurisdiction:

> LCAPP's defenders respond that New Jersey's interference with capacity prices does not trigger preemption because it is a lawful exercise of the state's authority to promote new generation resources. New Jersey does have authority over local energy matters, including the construction of power plants. *See, e.g., So. Cal. Edison Co. & San Diego Gas & Elec. Co.*, 71 FERC ¶ 61,269, at 3 (1995). But LCAPP incentivizes the construction of new power plants by regulating the rates new electric generators will receive for their capacity. New Jersey could have used other means to achieve its policy goals. Because Congress has evinced its intent to occupy the entire field of interstate capacity rates, however, New Jersey's reasons for regulating in the federal field cannot save its effort: "any state law falling within that [federal] field is preempted." *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984).

[12] The Commissioner also may suggest that he will not set a rate here. Setting a rate is only part of regulating and compelling a wholesale transaction.  Exclusive Federal jurisdiction applies to "any rule, regulation, practice, or contract affecting such rate, charge, or classification." (*see*, 16 U.S.C. § 824e).  Whether or not the Commissioner sets a rate is not determinative of whether he intrudes into a field of exclusive Federal regulation.  Section 201(b)(1) of the FPA

2.    **Recent Decisions by the Third and Fourth Circuits Confirm That the Commissioner's Actions Are Preempted.**

The *Nazarian* decision from the Fourth Circuit, 75 F.3d 467, and the *Solomon* decision from the Third Circuit, 766 F.3d 241, found state programs materially identical to the one in this case to be preempted. In both those cases, just like this one, the state solicited bids from generators, who named the price at which they were willing to sell. The state then selected winning bidders, and compelled the utilities to enter into contracts guaranteeing the winning bidders a fixed long-term revenue stream for the sales of electricity – which was a price different than the market-price in the FERC-regulated auction market, just as the contract price here is different than the market price the generator would receive from the ISO-New England energy market, *supra* at 14; *see PPL EnergyPlus LLC v. Nazarian*, 974 F. Supp. 2d 790, 822 (D. Md. 2013) (describing selection process), *aff'd,* 753 F.3d 467 (4th Cir. 2014), *petitions for cert. filed*, Nos. 14-614, 14-623; *PPL EnergyPlus LLC v.*

---

provides exclusive jurisdiction for wholesale sales, not just prices or rates. So even assuming *arguendo* that the Commissioner does not fix a rate (an argument rejected in *Solomon* and *Nazarian*)), State authority is pre-empted in all respects over "the sale of electric energy at wholesale" and there is no dispute that the transactions at issue fall within that category.

*Hanna*, 977 F. Supp. 2d 372, 393-94 (D.N.J. 2013) (describing selection process), *aff'd*, 766 F.3d 241 (3d Cir. 2014), *petitions for cert. filed*, Nos. 14-634, 14-694.

The only material difference between those cases and this one involved the pricing mechanism used by the state to guarantee the fixed long-term revenue stream.  In those cases, the states adopted what is known as a "contract-for-differences": the winning bidders would sell into the market, and if market revenues fell below the contract price, the utilities would make up the difference.  If market revenues exceeded the contract price, the winning bidders would remit the excess back to the utilities. *See Solomon*, 766 F.3d at 252; *Nazarian*, 753 F.3d at 473-74.  The states argued in those cases that the contract-for-differences was a mere side financial arrangement akin to a hedge, and was not part of any sale of electricity.  And the key question in those cases was whether the side payments were sufficiently connected with the sale of electricity that they fell within the federal regulatory field.  The courts held that they were. *Nazarian*, 753 F.3d at 476; *Solomon*, 766 F.3d at 252-53.

This case is much simpler, and the intrusion into the federal field

is much more obvious and direct.  Rather than providing generators with revenue assurance by compelling utilities to enter into a complicated contract-for-differences, here the Commissioner will simply compel the utilities to buy the electricity itself.  Thus, there can be no question in this case that the Commissioner is regulating in the field of wholesale sales.[13]

The District Court in *Allco I* sought to distinguish *Nazarian* and *Solomon* on the ground that those cases involved state schemes with "market-distorting features."  However, that effort to distinguish the cases fails, for two reasons.  First, the presence or absence of market distortion is simply irrelevant to field preemption.  Under the doctrine of field preemption, state action is preempted merely because it lies

---

[13] The power purchase agreement used in this case is economically identical to the contract-for-differences at issue in *Nazarian* and *Solomon*, as is illustrated in the following example:

In both cases, the generator submits a bid to the state specifying the long-term rate per megawatt or megawatt-hour that the generator needs to be guaranteed (for example, $60). Suppose that the market price for energy is $50.  Under a <u>power purchase agreement</u> like the one here, the generator sells to utility for $60.  The utility then resells into the spot market (or avoids purchases from the spot market) at $50.  Under the <u>contract-for-differences</u>, the generator sells into the spot market at $50.  The utility makes a side payment to the generator of $10.  In both cases, the generator's net revenue is $60 and the utility's net cost is $10.

within an exclusive federal field – even when the state action is

*complementary* to federal policy. *See*, *Arizona v. United States,* 132 S.

Ct. 2492, 2502 (2012) ("Where Congress occupies an entire field, … even

complementary state regulation is impermissible. Field preemption

reflects a congressional decision to foreclose any state regulation in the

area, even if it is parallel to federal standards.")  Second, while market

distortion might be relevant to the doctrine of *conflict* preemption, the

complaint does allege a conflict with federal policy: specifically,

Congress has chosen to allow states to compel wholesale contracts only

for QFs under PURPA, and has not made the same accommodation for

larger renewable projects, which are expected to compete on their own

merits in the FERC-regulated wholesale market.  Interference with that

policy will impede the achievement of Congress's goals in enacting

PURPA.

### 3. Connecticut's portfolio management authority, and its authority over "local facilities" does not permit the intrusion in a field of exclusive Federal jurisdiction.

Fundamentally, the Defendants confuse the bright line between

wholesale transactions versus other actions of States that may have an

indirect effect on wholesale prices.  This case is not about trying to

decide what actions of a State have indirect effects on the wholesale market. Rather this case is about a State compelling a specific and identifiable wholesale energy transaction. The wholesale transactions between the Connecticut Utilities and the RFP winners will not have occurred but for the state action of the Commissioner compelling the transaction.

Nor are the Defendants assisted by language from the Second Circuit's opinion in *Entergy*[14] and from the Supreme Court's opinion in *New York,* 535 U.S. at 24 referencing State jurisdiction of local service issues, demand side management (which is an absence of an energy transaction), resource planning, utility generation and resource portfolios, and retail stranded cost charges. The language from those

---

[14] *See, Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, 733 F.3d 393, 417 (2d Cir. 2013) ("Vermont Legislature can direct retail utilities 'purchase electricity from an environmentally friendly power producer in California or a cogeneration facility in Oklahoma,' if it so chooses".) That statement in *Entergy* quoted from the Supreme Court's opinion in *New York* in which the Supreme Court observed merely that the "purchase electricity from an environmentally friendly power producer in California or a cogeneration facility in Oklahoma" (*New York,* 535 U.S. at 8) was physically possible. It neither says nor implies anything about the power of a State to compel a wholesale transaction from such facilities.

cases says nothing about that authority reducing FERC's exclusive jurisdiction over wholesale sales.

Indeed, the Defendants' argument in this case would create a massive loophole in the FPA that would destroy FERC's ability to regulate the market in a uniform and coherent manner. FERC has chosen a market-based approach to regulation, in which some generators sell their output into a wholesale auction administered by a FERC-regulated entity known as ISO-New England, and others enter voluntary bilateral contracts with willing purchasers. Such a market-based system simply cannot function as FERC intended it if States are free to mandate involuntary wholesale transactions that, but for the State's intervention into the wholesale marketplace, would never have taken place. Under the guise of regulating utility purchasing decisions, States could simply take over the entire wholesale market, effectively eliminating FERC's regulatory power and supplanting its chosen regulatory approach. The FPA prevents even the possibility of such interference by excluding States altogether from the field of wholesale sales. *See Nazarian*, 763 F.3d at 477 (holding that "[e]ven if collision between the state and federal regulation in this case is not an inevitable

38

consequence, it is sufficiently likely to warrant invalidating [a State] program in order to assure the effectuation of the comprehensive federal regulation ordained by Congress.") (quotation marks omitted). Of course, with respect to QFs under PURPA – which by definition are small and thus pose less of a threat to a uniform federal regulatory scheme – Congress has reached a different conclusion and *has* authorized State regulation of wholesale sales.  That is why, Allco can simultaneously object to contracts awarded to non-QF generators and contend that its injuries would be redressed by limiting contracts awarded to QFs.

The issue here is a narrow one which does not detract from a State's ability to influence utilities' purchasing decisions to buy from certain types of generation, or reviewing those for prudence in connection with retail rate recovery.  Yet, there needs to be a line drawn somewhere and Congress drew the bright-line in the first sentence of FPA Section 201(b)(1) at wholesale sales in interstate commerce, which the contracts the Commissioner will compel unquestionably are.

II.    COUNT II-VIOLATION OF THE DORMANT COMMERCE CLAUSE.

   A.    Standing and jurisdiction as to Count II.

    1.    The Plaintiff's Dormant Commerce Clause claim is redressable.

The PURA Defendants argue that Allco's dormant Commerce Clause claim is not redressable because striking down Connecticut's prohibition on certain out-of-state RECs would not aid Plaintiff because it would not make Plaintiff's RECs recognizable under the Connecticut statute.  That position simply misreads the statute.

Connecticut's RPS (*see* Conn. Gen. Stat. § 16-245a) requires electric suppliers to have a certain percentage of their electricity mix be attributable to renewable energy sources. The Plaintiff's out-of-state facilities qualify as a  "Class I renewable energy source" under Conn. Gen. Stat §16-1(a)(20).  Thus, but for the existence of the offensive limiting parts in Conn. Gen. Stat. § 16-245a(b)(1) (which the Complaint asks this Court to invalidate), the Plaintiff's RECs would be marketable to Connecticut Utilities for use to comply with their RPS obligations. Therefore once this Court invalidates the offensive language, the remaining language will operate so that Allco's RECs will qualify for Connecticut's RPS.

40

Even if, however, as the PURA Defendants argue, striking out the offensive statutory language would not allow the Plaintiff to sell its out-of-region RECs to the Connecticut Utilities, Allco's injury-in-fact of being unjustifiably disadvantaged in comparison to other REC sellers who are similarly situated would be redressed.

## B. The Merits of Count II.

### 1.   The Defendants' ban on out-of-region RECs is *per se* unconstitutional.

State laws that are facially discriminatory to Interstate Commerce are subject to strict scrutiny (compelling state interest + narrowly tailored), and will be found invalid unless the state can show that the policy serves a sufficiently legitimate state interest which could not be served as well by available nondiscriminatory means. *Maine v. Taylor*, 477 U.S. 131 (1986).  An over-arching goal of environmental preservation is not a sufficient state justification to render a discriminatory regulation valid. *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 206 (1994).  Thus Connecticut's ban on Plaintiff's out-of-region RECs must fail.

The case of *Illinois Commerce Commission v. FERC*, 721 F.3d 764 (7th Cir. 2013) *cert. den.* 134 S. Ct. 1277 (2014), involved a similar

situation involving issues of environmental goals, which is the Defendants' purported justification for its out-of-region ban. That case involved the cost-sharing for construction of an interstate transmission line that among other things would deliver out-of-state renewable energy to Michigan. The State of Michigan argued, much like the Defendants have here, that the line was needed because actual delivery of electricity into the qualifying region (there, Michigan and here, ISO-New England) was required under the Michigan renewable energy statute. Judge Posner writing for the Seventh Circuit stated that Michigan's prohibition of crediting any and all out-of-state energy against it RPS was unconstitutional (*see*, 721 F.3d at 776):

> Michigan's first argument—that its law forbids it to credit wind power from out of state against the state's required use of renewable energy by its utilities—trips over an insurmountable constitutional objection. Michigan cannot, without violating the commerce clause of Article I of the Constitution, discriminate against out-of-state renewable energy. *See Oregon Waste Systems, Inc. v. Department of Environmental Quality*, 511 U.S. 93, 100-01, 114 S. Ct. 1345, 128 L. Ed. 2d 13 (1994); *Wyoming v. Oklahoma*, 502 U.S. 437, 454-55, 112 S. Ct. 789, 117 L. Ed. 2d 1 (1992); *Alliance for Clean Coal v. Miller*, 44 F.3d 591, 595-96 (7th Cir. 1995); Steven Ferrey, "Threading the Constitutional Needle with Care: The Commerce Clause Threat to the New Infrastructure of Renewable Power," 7 Texas J. Oil, Gas & Energy Law 59, 69, 106-07 (2012).

Here, although Connecticut credits some out-of-state renewable energy toward its RPS that fact does not alter the fact that it facially discriminates against renewable energy from all other States, including the Plaintiff's RECs. Moreover, the Defendants have confessed that their ban on out-of-region RECs is not necessary, much less the only way to satisfy alleged goals of grid reliability and renewable energy. *See* Comm'r. Memo. at 24.  The Commissioner acknowledges that Allco's out-of-region solar RECs qualify for the Connecticut Clean Energy Options program. The Commissioner has also acknowledged that the North American Renewables Registry (NAR) REC tracking system, which can be used for Allco's RECs, is just as reliable as the ISO-New England tracking system.

In *Maryland v. Wynne*, 135 S. Ct. 1787 (2015), the Court made it clear that bans against the products of other States (which Allco's out-of-region RECs are) are one of the evils the Commerce Clause was intended to address. The dormant Commerce Clause "strikes at one of the chief evils that led to the adoption of the Constitution, namely, state tariffs and other laws that burdened interstate commerce." 135 S. Ct. at 1794.  The Commerce Clause grants Congress power to "regulate

43

Commerce . . . among the several States." Art. I, § 8, cl. 3. Those "few simple words . . . reflected a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Hughes v. Oklahoma*, 441 U.S. 322, 325-326 (1979). Balkanization is exactly what the Defendants advocate.

The Defendants chief defense is that 90% of its RECs are purchased from out-of-state, thus Connecticut argues that its law does not favor in-state interests. Creating economic regions among States that would band together and prohibit commerce, ban products or impose tariffs on commerce from States outside the region is equally offensive to the economic balkanization that the Commerce Clause was intended to prohibit. *See, Ne. Bancorp, Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 472 U.S. 159, 174 (1985) ("There can be little dispute that the dormant Commerce Clause would prohibit a group of States from establishing a system of regional banking by excluding bank holding companies from outside the region if Congress had remained

completely silent on the subject.") (citing *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 39-44 (1980)).

A State "may not, under the guise of exerting its police powers … make discriminations against the products and industries of some of the States in favor of the products and industries of its own or of other States." *Brimmer v. Rebman*, 138 U.S. 78, 82 (1891).  It is simply inconsistent with the concept of the federal Union for Connecticut to establish a preferential trade region and regulate a vital portion of interstate commerce under a discriminatory regime that boycotts disfavored states. *See, Great Atlantic & Pacific Tea Co. v. Cottrell*, 424 U.S. 366, 380-81 (1976), *quoting Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 523, n.17 (1935) ("The Constitution was framed under the dominion of a political philosophy less parochial in range. It was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division.")

The Connecticut act at issue in this case distinguishes among the RECs from other states explicitly on the basis of their state of origin. Connecticut opens its door to RECs of Massachusetts, Maine, New

Hampshire, Vermont and Rhode Island in an unqualified manner, but it excludes or attaches restrictions to RECs of New York, New Jersey, Pennsylvania, Georgia and the rest. It is difficult to imagine a more direct repudiation of the principle that "the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division."

Because Connecticut's ban facially discriminates against Allco's RECs and the Supreme Court has already rejected the environmental goal defense proffered by Defendants, the Defendants' motions to dismiss must be denied.

### 2. NEPOOL has discredited the Defendants' purported justifications for its ban on out-of-region RECs.

Connecticut argues that it has a valid justification for its policy because it is trying to reduce emissions, and avoid "double counting" of RECs. Connecticut's restrictions on out-of-region RECs for environmental and "double-counting" reasons has been discredited by NEPOOL, the entity that Defendants attempt to employ to justify their discriminatory policy. *See*, *In the Matter of the Appeal Case Brookfield Energy Marketing, Inc.*, No. 02-NE-BD-2008 (NEPOOL Board of

Review 2009)[15].  There the NEPOOL Board of Review rejected the policy basis of the very purported geographical restriction that Connecticut advances here to justify it ban.  The NEPOOL decision stated that such an argument is inefficient and "is inconsistent with the States' positions in the RGGI (Regional Greenhouse Gases Initiative) agreement … which aim to reduce coal fired generation and to promote 'cleaner' generation….[T]he Northeast's clean air concerns and the partial resolution of those concerns through the increased use of renewable energy extend beyond the New England States and the adjacent control areas." *Id.* at 10.  As to the double-counting issue, NEPOOL brushed it off as a concern noting that it was merely an administrative issue that could be easily addressed. *Id.* at 12.

Finally, contrary to the Defendants' argument, the *Pike* test[16] is not relevant here because Connecticut's law facially discriminates against Allco's out-of-region RECs.  But in any case, even if the Court eventually concludes that Connecticut's ban should be reviewed under the *Pike* test, the alleged factual justification for Connecticut's ban and

---

[15] Available at www.nepool.com/uploads/RB_Decision_2008_02.pdf.

[16] *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970).

how the relevant factors might be balanced is a factual issue which is inappropriate for resolution in a motion to dismiss.  That is particularly so when, as here, Connecticut's purported justification for its ban has been discredited by NEPOOL and is belied by its treatment of RECs under its Clean Energy Options program.

## III.   COUNT III-VIOLATION OF 42 U.S.C §1983.

### A. The Defendants have failed rebut the presumption that Allco has a claim under 42 U.S.C. § 1983.[17]

#### 1. Plaintiff's rights are presumptively enforceable by 42 U.S.C. §1983.

"Once a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by §1983." *See Gonzaga University v. Doe*, 536 U.S. 273, 284 (2002). "The defendant may defeat this presumption by demonstrating that Congress did not intend that

---

[17] The Commissioner asserts that he is not a state regulatory authority (*see*, Comm'r Memo. at 25).  The Commissioner's status as a state regulatory authority under the FPA is not relevant to the claims under Section 1983.  But the Commissioner is indeed a state regulatory authority under the FPA because his actions compelling wholesale energy transactions result in an automatic change in retail rates.  The Commissioner's assertion that he is not a state regulatory authority also contradicts the position he has recently taken before the Second Circuit in the appeal of *Allco I* where he has argued that Allco should have satisfied the administrative exhaustion requirements of Section 210(h)(2)(B), which position could only be taken if the Commissioner were in fact a state regulatory authority.

remedy for a newly created right . . . evidence of [which] may be found directly in the statute creating the right, or inferred from the statute's creation of a comprehensive enforcement scheme that is *incompatible* with individual enforcement under § 1983." *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120 (2005) (internal citations and quotations omitted; emphasis added.)[18]  "The ordinary inference that the remedy provided in the statute is exclusive can surely be overcome by textual indication, express or implicit, that the remedy is to complement, rather than supplant, § 1983." *Id.* at 122.   The burden to demonstrate that Congress has expressly withdrawn the remedy is on the defendant. *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 106 (1989). "We do not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy for the deprivation of a federally secured right." *Id.* at 107.  Moreover, the mere existence of a comprehensive enforcement does not preclude 1983 remedies.  *Id.* at 108.

---

[18] For example, the Supreme Court foreclosed a § 1983 action in *Smith v. Robinson*, 468 U.S. 992, 1012 (1984) because a § 1983 action "would . . . render superfluous most of the detailed procedural protections outlined in the statute"). *See, Smith*, 468 U.S. at 1011-1012.  That is not the case here.  Nothing in Section 210(h)(2)(B) would be superfluous if a cause of action under Section 1983 or a pre-emption claim were allowed.

49

Congress enacted PURPA to address the conditions in the electricity market that evolved since the passage of title II of the FPA in 1935. *See, New York v. FERC*, 535 U.S. 1, 9 (2002).  QFs are intended beneficiaries of PURPA, and the FPA as amended by PURPA. *See, Freehold Cogeneration Assoc. L.P. v. Bd. Regulatory Comm'rs,* 44 F.3d 1183, 1991 (3d Cir. 1995) ("*Freehold*') ("Section 210 of PURPA sets forth the benefit to which QFs are entitled. It creates a market for their energy."); *S. Cal. Edison Co. v. FERC*, 195 F.3d 17, 23 (D.C. Cir. 1999) ("in deciding to confer substantial benefits on 'small power production facilities' Congress took care to define the class of potential beneficiaries.")

The Supreme Court has observed that "in all of the cases in which we have held that § 1983 is available for violation of a federal statute, we have emphasized that the statute at issue . . . did not provide a private judicial remedy (or, in most of the cases, even a private administrative remedy) for the rights violated." *City of Rancho Palos Verdes v. Abrams*, 544 U.S. at 121.  That is the case here.  While Section 210(h)(2) of PURPA provides for a remedy, it is, as discussed above, unconstitutional.  Thus it is not a remedy at all.  But even if it

50

were constitutional, that remedy only covers a very narrow circumstance, and does not address many of the rights of QFs under the FPA or Section 210 of PURPA as the Second Circuit recognized in *Niagara*, the Third Circuit recognized in *Freehold* and the Ninth Circuit recognized in *Indep. Energy Producers Ass'n v. California Pub. Utils. Comm'n,* 36 F.3d 848, 856, fn. 13 (9th Cir. 1994) ("*Indep. Energy*").

Far from supplanting other rights of action, Section 210(h)(2), if constitutional, would provide a complementary process in a narrow set of specifically defined circumstances in order to force a State to "implement" FERC's rules through a public notice and hearing process.

### 2. The Second Circuit has already recognized that an action under Section 210(h)(2) is neither an exclusive nor comprehensive PURPA remedy.

Even if the Section 210(h)(2)(B) action were constitutional, as the Second Circuit acknowledged in *Niagara*, certain actions lie under PURPA beyond the confines of Section 210(h)(2), such as actions to enforce the exemption from State laws contained in Section 210(e)(1), even though such actions are not expressly delineated under the statute. *See*, *Niagara*, 306 F. 3d at 1270 discussing *Freehold. See also, Indep. Energy*, 36 F.3d at 856, fn. 13 (noting that the specific state

jurisdictional limitation in Section 210(g) "says nothing about the state's authority to oversee QF status determinations, which is covered by section 201" of PURPA.)

### 3. Section 210(h)(1) provides for direct enforcement.

Section 210(h)(1) provides for a separate action for "any operations of an electric utility, a qualifying cogeneration facility or a qualifying small power production facility which are subject to the jurisdiction of the Commission under part II of the FPA." Operations of a QF include the QF's put right at the long-term rate under 18 C.F.R. §292.304(d)(2)(ii), i.e., an electric utility's must-buy obligation, as well as any wholesale sale to an electric utility. Section 210(h)(1) expressly provides that the rules that the FERC has prescribed under Section 210(a) are rules under the FPA to the extent they relate to such operations, specifically placing such suits into the general rule of Section 825p of the FPA giving broad and exclusive jurisdiction to the federal courts.  Section 210(h)(1) also plainly demonstrates that by including actions related to operations of a QF (which is what would be involved) in Section 210(h)(1), those actions cannot also be included in Section 210(h)(2).

### 4. There are other signposts in the FPA and PURPA that support the conclusion that the expression of the Section 210(h)(2)(B) action did not preclude others.

i. *Section 824v*.

When Congress wanted to exclude private right of actions in Part II of the FPA it specifically so stated. *See*, 16 U.S.C. 824v.  In FPA Section 824v Congress gave authority to the FERC to prescribe rules prohibiting market manipulation, which rules then would have the force of law.  Congress did the same thing here with respect to prescribing rules to encourage small power production.  In FPA Section 824v(b), however, Congress expressly stated that no private action could be maintained under FPA Section 824v.  Congress make no such statement when it came to Section 210.

ii. *Section 123 and the Conference Report*.

Similarly, when Congress intended to impose limits on actions under PURPA, it used such express language.[19]  However, the most telling indicator that Congress did not intend for its specifically stated judicial review provisions to be exclusive is Congress' statement to that

---

[19] *See*, Section 123(a) of PURPA discussed above.  *See also*, Section 307 of PURPA (now codified at 15 U.S.C §3207) which used almost identical *express* language as Section 123.

effect in the Conference Report.  Section 210 of PURPA contains two

express provisions regarding judicial review.  Those are contained in

Section 210(g) and (h).  The Conference Report, however, contains no

discussion specifically on Sections 210(g) or (h).  But the text of Section

210(g) cross-references itself to the judicial review provisions of Section

123 in which Congress outlined specific judicial review provisions for

specific circumstances.  In the section of the Conference Report dealing

with Section 123's judicial review provisions, Congress made it clear

that the express judicial review provisions were neither comprehensive

nor exclusive.  Rather Congress made it clear that the expression of

those specific provisions only applied in the specifically enumerated

circumstances and did not restrict jurisdiction to other rate related

claims. *See*, Conf. R. at 7818  ("With regard to this section, the conferees

do not intend to foreclose Federal courts from jurisdiction to review

cases involving electric utility rates which do not involve actions arising

under subtitle A, B, or C.")  That statement from the Conference Report

eliminates any doubt that the expression of specific enforcement

provisions in PURPA displaced other actions.

B. <u>**The Defendants are not immune from liability under 42 U.S.C. §§1983 and 1988.**</u>

The Defendants argue that they are immune from a Section 1983 action under *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 106 (1984) and *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). The Defendants are incorrect.

First, the *Pennhurst* case is inapposite as the Commissioner admits. That case applies to alleged violations of state law, which is not the case here. Plaintiff has alleged violations of federal law.

Second, the *Will* case is relevant but not in the way Defendants have argued. The Plaintiff's claims under Sections 1983 and 1988 seek damages, injunctive relief and fees. The *Will* case is only relevant to the issue of damages. With respect to injunctive relief the Supreme Court made clear that its ruling in *Will* would not interfere with other relief under Section 1983. *See, id.* at fn. 10 ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because official-capacity actions for prospective relief are not treated as actions against the State." (internal quotations omitted.) With respect to Section 1988's fees and costs, the *Will* case is

not applicable as it relates only to Section 1983.

As to damages, the Defendants are correct that the *Will* case would preclude an award of damages if the damage award would be paid from the State treasury.  Damage awards in Section 1983 actions, however, are available if not paid from the State treasury.  *Scheuer v. Rhodes*, 416 U.S. 232, 237-38 (1974) (overruled, on other grounds, by *Davis v. Scherer*, 468 U.S. 183 (1984)).  We do not yet know whether that would be the case here.  Plaintiff has reason to believe that, at least with respect to the PURA Defendants, any such award would be paid by utility ratepayers as opposed to being from the general state treasury.   Plaintiff acknowledges, however, that an amendment to the Complaint would be needed in order to eliminate the references to the Defendants being sued solely in their official capacities and Plaintiff requests that the order issued by the Court on the motions to dismiss grant leave to make such an amendment.

## CONCLUSION

For the foregoing reasons, this Court should deny the Defendants' motions to dismiss.

Respectfully submitted this 19th day of July 2015.

>*/s/ Thomas Melone*
>Thomas Melone, Esq. (ct29758)
>Allco Renewable Energy Limited
>77 Water Street, 8th floor
>New York, New York 10005
>(212) 681-1120
>Thomas.Melone@AllcoUS.com
>
>*ATTORNEY FOR PLAINTIFF*

## CERTIFICATE OF SERVICE

I hereby certify that on July 19, 2015, a copy of the foregoing Plaintiff's memorandum of points and authorities in opposition to Defendants' motions to dismiss was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to any one unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Thomas Melone*
Thomas Melone, Esq. (ct29758)
Allco Renewable Energy Limited
77 Water Street, 8th floor
New York, New York 10005
(212) 681-1120
Thomas.Melone@AllcoUS.com

*ATTORNEY FOR PLAINTIFF*

58